UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

CARLOS DOMENECH ZORNOZA,               )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Case No._____
                                       )
                                       )
                                       )
TERRAFORM GLOBAL, INC.,                )
7550 Wisconsin Avenue, 9th Floor       )
Bethesda, Maryland 20814               )
                                       )
Serve Registered Agent:                )
        Corporation Service Company    )
        2711 Centerville Rd., Suite 400 )
        Wilmington, DE 19808,          )
                                       )
TERRAFORM POWER, INC.,                 )
7550 Wisconsin Avenue, 9th Floor       )
Bethesda, Maryland 20814               )
                                       )
Serve Registered Agent:                )
        Corporation Service Company    )
        2711 Centerville Rd., Suite 400 )
        Wilmington, DE 19808,          )
                                       )
AHMAD CHATILA,                         )
        24931 Prospect Avenue          )
        Los Altos Hills, CA 94022-5107, )
                                       )
BRIAN WUEBBELS,                        )
        11663 O'Sanna Lane             )
        Highland, IL  62249,           )
                                       )
MARTIN TRUONG,                         )
        12371 Ironstone Road           )
        St. Louis, MO 63131,           )
                                       )
EMMANUEL HERNANDEZ,                    )
        3467 Malibu Terrace            )
        Fremont, CA  94539,            )

and                                                    )
                                                       )
PETER BLACKMORE,                                       )
        50 Barry Lane                                  )
        Atherton, CA 94027                             )

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Carlos Domenech Zornoza ("Mr. Domenech") brings this action against his former employers, TerraForm Global, Inc. ("GLBL") and TerraForm Power, Inc. ("TERP"), as well as individual defendants Ahmad Chatila, Brian Wuebbels, Martin Truong, Emmanuel Hernandez and Peter Blackmore (the "Individual Defendants"). The Individual Defendants are all present or former senior officers and directors of GLBL, TERP, and/or their controlling parent company, SunEdison, Inc. ("SUNE," and together with GLBL and TERP, the "Companies"). Mr. Domenech – the former President and Chief Executive Officer ("CEO") of GLBL and TERP, as well as a former Executive Vice President ("EVP") of SUNE – asserts claims under federal law for violation of whistleblower protection provisions, as well as claims for promissory estoppel and breaches of the implied covenant of good faith and fair dealing.

In support of his claims, Mr. Domenech makes the following allegations upon personal knowledge as to himself and his own acts, and upon information and belief (including review of publicly available information) as to all other matters, and alleges as follows:

## OVERVIEW OF THE ACTION

1.      This case arises from the ruthless efforts of corporate officers and directors – in the midst of a conspiracy to cover up their financial mismanagement, false reporting of financial results and forecasts, and other misconduct – to silence and punish Mr. Domenech for refusing to participate in their unlawful scheme. As discussed below, each of the Individual Defendants conceived and/or knowingly acted in furtherance of the conspiracy, which ultimately resulted in

the financial collapse and bankruptcy of SUNE, severe losses to Defendant GLBL, and billions of dollars of losses to the Companies' public shareholders.

2.      In the Fall of 2015, as SUNE was rapidly descending into a liquidity crisis, Defendant Chatila, the CEO of SUNE, and Defendant Wuebbels, the Chief Financial Officer ("CFO") of SUNE, embarked on a two-pronged effort to save themselves from the looming consequences of their mismanagement.  For one, in order to buy time, Chatila and Wuebbels began falsely reporting SUNE's actual and projected cash holdings.  These false reports were made both internally to SUNE's other senior officers and directors and externally to the investing public.  Second, Chatila and Wuebbels, with the assistance and support of SUNE's General Counsel and Corporate Secretary, Defendant Truong, proposed a series of self-dealing transactions between SUNE and its partially-owned but wholly-controlled subsidiaries – GLBL and TERP – designed to siphon hundreds of millions of dollars from the subsidiaries into SUNE's coffers to the severe detriment of GLBL and TERP's public shareholders (the "Proposed Self-Dealing Transactions").  Notably, at the time they presented the Proposed Self-Dealing Transactions, Chatila served as the Chairman of the Board of Directors of both GLBL and TERP, and Wuebbels and Truong were also members of the GLBL and TERP Boards.

3.      In October and November of 2015, Mr. Domenech and three of the other most senior executives of the Companies brought various aspects of Defendant Chatila and Wuebbels' misconduct to the attention of SUNE's Board of Directors, including, among others, Individual Defendants Blackmore (Chair of the SUNE Board's Corporate Governance Committee and a nine-year SUNE director) and Hernandez (Chairman of SUNE's Board of Directors).  During that time, in a SUNE Board meeting and in one-on-one conversations with individual directors, Mr. Domenech and others repeatedly advised SUNE's Board that Defendants Chatila and

Wuebbels appeared to be providing the Board and the investing public with unreliable or inaccurate information about SUNE's cash position.  In each instance, the SUNE Board – including each of the Individual Defendants – failed to take any material action in response to those warnings, and ultimately took actions in furtherance of the unlawful scheme.

4.      In his capacities as President and CEO of each of GLBL and TERP, Mr. Domenech advocated against the Proposed Self-Dealing Transactions.  Because of the self-dealing nature of those proposed transactions, neither GLBL nor TERP could proceed with any such transaction without the approval of its Corporate Governance and Conflicts Committee of GLBL or TERP (each a "Conflicts Committee").  Each of the Conflicts Committees consisted of independent directors who had no ties to SUNE.  Mr. Domenech regularly attended meetings of the GLBL and TERP Conflicts Committees at the request of the Committees to provide his opinion and pointed out the obvious reasons none of the Proposed Self-Dealing Transactions should be approved, namely, because they generally involved pre-payments from GLBL or TERP to SUNE for projects in early stages of development without corresponding collateral or economic value to protect against the risk of non-performance or bankruptcy on the part of SUNE.  Up to and through November 19, 2015, the GLBL and TERP Conflicts Committees declined to approve any of the Proposed Self-Dealing Transactions.

5.      On Friday, November 20, 2015 – as part of a purge labeled by Bloomberg Financial and other financial publications as the "Friday Night Massacre" – SUNE and each of the Defendants retaliated against Mr. Domenech, terminating him without notice or cause from all positions with the Companies.

6.      The Friday Night Massacre involved a series of maneuvers designed to eliminate all impediments to SUNE's ability to improperly pull cash immediately out of GLBL and TERP

and punish Mr. Domenech for speaking truth to power.  Bereft of cash and facing an imminent call on a $100 million margin loan on that day, SUNE and the Defendants took the following measures, among others:

- SUNE, as GLBL and TERP's controlling shareholder, voted to add three new members to the GLBL and TERP Boards, and then appointed SUNE loyalists to those seats;

- Defendant Blackmore – *a nine-year member of SUNE's Board* and a close confidante of Defendant Chatila and SUNE's Chairman, Defendant Hernandez – resigned from the SUNE Board and was immediately appointed as the new, supposedly "independent" Chairman of the GLBL and TERP Boards;[1]

- Led by Defendant Blackmore, the expanded GLBL and TERP Boards replaced all members of the GLBL and TERP Conflicts Committees with Defendant Blackmore and two other newly-elected Directors who had no prior involvement with any of the Companies;

- Led by Defendant Blackmore, each of the expanded GLBL and TERP Boards voted to fire Mr. Domenech *without cause* from his positions as President and CEO, and remove him from the Board, of each of those entities; and

- SUNE terminated Mr. Domenech *without cause* from his position as its Executive Vice President and all other employment with any other SUNE affiliates.

7.      In response to the foregoing actions, three members of the GLBL and TERP Boards immediately resigned.  All three of the resigning directors expressly advised the GLBL and TERP Boards that they had done so because, in light of the actions taken that day, they believed they could no longer protect the interests of GLBL and TERP's shareholders as members of those Boards.

8.      As independent director Mark Florian explained in his resignation letter dated November 20, 2015,

> I am resigning from the Board of Directors of both TerraForm Power and TerraForm Global effective immediately.  As an independent director, I have been working hard and in good faith to protect the interests of the stockholders.  **As a**

---

[1]  Although no longer Chairman of GLBL and TERP, Defendant Chatila remained a member of the Boards of both subsidiaries.

**result of the Board's actions today, I do not believe I will be able to do so going forward and therefore resign**. (Emphasis added).

9.      Similarly, independent Director and former Conflicts Committee Mark Lerdal wrote in his resignation letter of the same day:

> I am resigning from the Board of Directors of both [TerraForm Power and TerraForm Global] effectively immediately. The respective Conflicts Committees, as constituted before today, together with independent advisors, had been working hard and in good faith to protect the interests of the stockholders of the two companies. **As a result of today's actions of each of the Boards, I don't believe I will be able to do so going forward and therefore resign**. (Emphasis added).

10.     Having purged all meaningful resistance to the Proposed Self-Dealing Transactions, Defendant Blackmore – acting in collusion with the other Individual Defendants and with utter disregard for the interests of GLBL's public shareholders – immediately led the hastily-reconstituted GLBL Conflicts Committee into approving a substantially expanded version of one of those transactions.  Indeed, *within minutes* of his appointment as Chairman of GLBL's Conflicts Committee on Friday, November 20, 2015, Defendant Blackmore had GLBL wire $150 million from its bank account to SUNE in connection with that improper transaction.

11.     Eleven days later, on December 1, 2015, Defendant Blackmore further advanced the unlawful scheme by gaining the approval of GLBL's Conflicts Committee to "amend" the self-dealing transaction – in return for no material consideration – such that GLBL agreed to, and did in fact, immediately wire an additional $81 million to SUNE.

12.     Predictably, within a matter of months, SUNE announced that due to cash constraints, it could not honor its obligations to GLBL under the self-dealing transaction that Defendant Blackmore had ushered through in connection with the Individual Defendants' scheme, thereby subjecting GLBL and its public shareholders to a potential total loss of $231 million.

13.     On February 29, 2016, SUNE announced that it was "unable to timely file its Annual Report on Form 10-K for the fiscal year . . . ."  Within its filing that day with the U.S. Securities and Exchange Commission ("SEC"), SUNE revealed that independent counsel hired by SUNE, "with the assistance of accounting and financial advisors," had advised SUNE to assess seriously the allegations of "a current and a former employee of the Company" regarding the accuracy of SUNE's financial statements.  SUNE also acknowledged in that filing that it may have to "reassess the Company's liquidity position as well as the disclosures in the Form 10-K, including whether the Company may require greater liquidity than previously anticipated and/or whether the sources are sufficient to meet its requirements."

14.     On March 31, 2016, SUNE announced in a Form 8-K filed with the SEC that, in addition to being under investigation by the SEC, SUNE had received a subpoena from the U.S. Department of Justice seeking information and documents relating to, among other topics, intercompany transactions between SUNE and each of GLBL and TERP and certain investigations by SUNE's audit committee.

15.     And on April 21, 2016 – just five months after Defendants' retaliatory discharge of Mr. Domenech and without having fulfilled its obligations under the improperly approved self-dealing transaction with GLBL – SUNE filed for Chapter 11 bankruptcy protection.

## THE PARTIES

16.     Plaintiff Carlos Domenech Zornoza is the former President and CEO of each of GLBL and TERP, and a former member of both the GLBL and TERP Boards.  He is also a former EVP of SUNE.  Mr. Domenech resides in Kensington, Maryland.

17.     Defendant GLBL is a Delaware corporation that maintains its principal place of business at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814.  GLBL is a controlled

subsidiary of SUNE.  SUNE owns approximately 36% of GLBL's outstanding shares of stock and controls approximately 98% of GLBL's voting power.  The remaining 64% of GLBL's outstanding shares of stock is largely owned by public shareholders and traded on NASDAQ. GLBL has not filed for bankruptcy.

18.     Defendant TERP is also a Delaware corporation that maintains its principal place of business at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814.  Like GLBL, TERP is a controlled subsidiary of SUNE.  SUNE owns 43% of the total outstanding shares of TERP and controls approximately 88% of TERP's voting power.  The remaining 57% of TERP's outstanding shares of stock is largely owned by public shareholders and traded on the New York Stock Exchange.  TERP has not filed for bankruptcy.

19.     At all relevant times until June 22, 2016, Defendant Ahmad Chatila was the President and CEO of SUNE and a member of SUNE's Board of Directors.  And at all relevant times until November 20, 2015, Chatila was the Chairman of both GLBL's Board of Directors and TERP's Board of Directors.  Although Chatila resigned as the Chairman of GLBL's Board of Directors and TERP's Board of Directors on November 20, 2015, he remained a member of both the GLBL and TERP Boards at all times until his resignation on May 26, 2016.

20.     Defendant Brian Wuebbels is a former Executive Vice President and Chief Financial Officer ("CFO") of SUNE.  He held those positions at all relevant times until his termination effective June 9, 2016.  Wuebbels was also a Director of GLBL and TERP at all relevant times until his resignation on March 30, 2016, and served as the President and CEO of both GLBL and TERP from November 20, 2015, until March 30, 2016.

21.     Defendant Martin Truong has at all relevant times been the Senior Vice President, General Counsel, and Secretary of SUNE.  He was also a member of the Board of Directors of GLBL and TERP at all relevant times until his resignation on August 30, 2016.

22.     Defendant Emmanuel Hernandez has served at all relevant times as Chairman of the Board of Directors of SUNE.  And at all times since November 20, 2015, he has held the position of Executive Chairman of SUNE.

23.     Defendant Peter Blackmore was a member of the Board of Directors of SUNE for nine years from 2006 until November 20, 2015.  On that day, he resigned from the SUNE Board and was immediately installed at SUNE's direction as the Chairman of the Board of Directors of both Defendant GLBL and TERP.  Defendant Blackmore has remained Chairman of both the GLBL and TERP Boards, and the Conflicts Committee of both Boards, at all times since then. In addition, since March 30, 2016, Defendant Blackmore has served as Interim CEO of both GLBL and TERP.

24.     Non-Defendant SUNE is a Delaware corporation with operational headquarters in Belmont, California.  SUNE filed for Chapter 11 bankruptcy protection on April 21, 2016.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, namely 29 U.S.C. § 1140 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 ("Dodd-Frank").

26.     This Court has personal jurisdiction over Defendants GLBL and TERP pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-102(a) because GLBL and TERP maintain their respective headquarters in the State of Maryland.

27.     This Court has personal jurisdiction over Defendant Chatila under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because at all relevant times, in connection with his duties as a director of GLBL and director of TERP (and also Chairman of both companies' Boards for much of the relevant time period), Chatila had regular contacts with this jurisdiction, both physically and otherwise, and the claims herein arise out of such contacts.  For example, without limitation, Chatila had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on at least a monthly basis – came to Maryland to conduct GLBL and TERP business.  Chatila also regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.

28.     This Court has personal jurisdiction over Defendants Wuebbels and Blackmore under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because they each have served during the relevant time period as CEO and a member of the Board of Directors of both GLBL and TERP; have had regular contacts with this jurisdiction, both physically and otherwise, in those capacities; and the claims herein arise out of such contacts.  For example, without limitation, at all relevant times until March 30, 2016, Defendant Wuebbels had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on at least a monthly basis – came to Maryland to conduct GLBL and TERP business.  Wuebbels also regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.  Similarly, without limitation, at all relevant times since November 20, 2016, Defendant Blackmore has had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on almost a weekly basis – has come to Maryland to conduct GLBL and TERP business.  Defendant Blackmore has also regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.

29.     This Court has personal jurisdiction over Defendant Truong under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because, as a member of the Board of Directors of GLBL and TERP during the relevant time period, as well as in his capacities as Senior Vice President and General Counsel of SUNE, Defendant Truong had regular contacts with this jurisdiction, both physically and otherwise, and the claims herein arise out of such contacts.  For example, he had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on at least a bi-monthly basis – came to Maryland to conduct business with or on behalf of GLBL and TERP.  In addition, Defendant Truong has regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.

30.     This Court has personal jurisdiction over Defendant Hernandez under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because at all relevant times he had regular contacts with this jurisdiction, both physically and otherwise, and the claims herein arise out of such contacts. For example, he has had more than weekly electronic and telephonic communication with TERP and GLBL employees in Maryland in his capacity as Chairman of the Board of Directors of SUNE, which controls both GLBL and TERP and employed Mr. Domenech in Maryland.  In addition, Defendant Hernandez has visited GLBL and TERP's respective Maryland headquarters in connection with business dealings between SUNE and GLBL and/or TERP, including, without limitation, with respect to oversight of the Companies' employees who serve in senior executive positions.

31.     Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. § 1332 because the acts and harms that form the basis for this Complaint occurred in this District and this Division.

## FACTS COMMON TO ALL COUNTS

*Relationship Between and Among the Companies*

32.     Before 2013, SUNE manufactured semiconductors, with particular expertise in providing products for solar energy producers.

33.     SUNE then transformed into a worldwide developer of renewable energy products, power plants and services.  Its business model was to use short-term financing to develop renewable energy power plants and then sell them.

34.     Like a number of other energy project developers, SUNE sponsored "yieldcos." A yieldco typically purchases completed or substantially-completed energy power plants from a sponsor and/or third parties, and then operates the plants to produce cash dividends for the yieldco's investors.

35.     SUNE sponsored its first yieldco, Defendant TERP, in early 2014.  TERP purchases and operates renewable energy projects in the developed world, specifically in North America, Chile and the United Kingdom.  TERP completed its initial public stock offering ("IPO") on July 18, 2014.

36.     In late 2014, SUNE sponsored a second yieldco, Defendant GLBL, which purchases and operates renewable energy projects in emerging markets.  GLBL completed its IPO on July 31, 2015.

37.     As discussed above, at all relevant times SUNE has maintained significant equity stakes in GLBL and TERP, and held voting control over both subsidiaries.

38.     GLBL and TERP each have a Management Services Agreement with SUNE pursuant to which SUNE provides management and administrative services to the two yieldcos. And, pursuant to other, related agreements, SUNE provided GLBL and TERP with "call rights"

-12-

to acquire qualified and specified projects that SUNE developed on its own or acquired from other entities.

### Grants of Stock to Induce Mr. Domenech
### to Accept Employment As President and CEO of TERP

39.     In late 2013, Defendant Chatila asked Mr. Domenech to serve as CEO and President of the first yieldco SUNE intended to launch, ultimately known as TERP.

40.     In order to induce Mr. Domenech to accept employment as CEO and President of TERP, Defendant Chatila offered Mr. Domenech, among other consideration, grants of TERP shares through that company's Long-Term Incentive Plan.

41.     Under one of the grants, the TERP shares were to vest over three years, with any unvested shares being subject to forfeiture under certain conditions.  More specifically, unvested shares were to be forfeited if Mr. Domenech ceased to be employed by TERP, SUNE or any of their affiliates unless he was terminated by the Companies "without Cause."[2]  If Mr. Domenech's employment with TERP, SUNE and all of their affiliates was terminated by the Companies "without Cause," 50% of any unvested shares would immediately vest.  TERP and Mr. Domenech memorialized the terms and conditions of that grant of shares in a written "Restricted Stock Agreement" dated February 24, 2014 (the "TERP Stock Agreement").

42.     Upon becoming President and CEO of TERP, and at all times during which he held that position, Mr. Domenech worked as an employee of TERP.  He led TERP's day-to-day business operations and strategic planning and execution; reported *every day* for work at TERP's headquarters in Bethesda, Maryland, unless he was traveling on business; traveled extensively on

---

[2]  Under the TERP Stock Agreement, "Cause" is defined to include, *inter alia*, failure by Mr. Domenech to make good-faith efforts to substantially perform his duties at TERP; dishonesty, willful misconduct or gross negligence in the performance of those duties; material breach of any written agreements with or policies of TERP; and certain types of criminal conduct.  Mr. Domenech's stock agreements with GLBL, which are discussed below, define "Cause" in similar terms with respect to GLBL's rights and interests.

TERP-related business; had a TERP business card; regularly negotiated and executed contracts on behalf of TERP; and reported directly to – and was directed in all of his TERP-related business activities by – TERP's Board of Directors.

43.     The TERP IPO proved to be a tremendous success and was more than 20 times oversubscribed.  Under Mr. Domenech's leadership, TERP showed immediate operational success as well, outperforming all of its material pre-IPO projections.  For example, from its IPO on July 18, 2014, to September 30, 2015, TERP increased its

- annualized EBITDA from $193 million to $355 million;[3]

- annualized cash available for distribution from $107 million to $225 million; and

- dividends per share from $.90 to $1.40.

***Grants of Stock to Induce Mr. Domenech***
***to Accept Employment As President and CEO of GLBL***

44.     Given the success of its first yieldco, SUNE proceeded with plans to launch a second yieldco, ultimately known as GLBL.  As discussed above, GLBL was formed for the stated purpose of acquiring and operating renewable energy power plants in developing-world countries, a market not served by TERP.

45.     In the Fall of 2014 – nine months before GLBL's IPO – Defendant Chatila asked Mr. Domenech to serve on GLBL's Board of Directors, with the understanding SUNE intended to appoint an executive leadership team for GLBL that was separate and distinct from the TERP leadership team and would not include Mr. Domenech.

---

[3]  "EBITDA" is an acronym for "earnings before interest, taxes, depreciation and amortization."  EBITDA "is used often in company valuations because it is a good proxy for operating cash flow.  It provides the operating cash a business could generate if net working capital is maintained from year to year."  *See* https://www.divestopedia.com/definition/722/earnings-before-interest-taxes-depreciation-and-amortization-ebitda.

46.     In late 2014, however, SUNE decided that GLBL would be best served, and most favorably received in its IPO, if it were led by the same, proven senior-executive team that had successfully launched TERP.  Accordingly, Defendant Chatila asked Mr. Domenech to take on the additional employment role of GLBL's President and CEO.

47.     In order to induce Mr. Domenech to accept the additional employment role of President and CEO of a second start-up company, as well a director of that entity, Chatila – on behalf of GLBL – offered Mr. Domenech two grants of shares in GLBL through that entity's Long-Term Incentive Plan.  More specifically, Mr. Domenech received a grant of GLBL shares dated September 26, 2014, and a second grant of GLBL shares dated March 31, 2015.  The terms of each of the grants are set forth in written Restricted Stock Agreements (the "GLBL Stock Agreements").

48.     The GLBL Stock Agreements each provided that the shares granted thereunder would vest in tranches annually over a four-year period.  Unlike the TERP Stock Agreement, the GLBL Stock Agreements do not contain vesting acceleration language providing that 50% of any unvested shares would immediately vest if Mr. Domenech's employment with the Companies and any affiliates were to be terminated without Cause.  The GLBL Stock Agreements do, however, expressly state that the Committee overseeing GLBL's Long-Term Incentive Plan (*i.e.,* the GLBL Board or its designee) have authority in its "sole discretion … to accelerate[] vesting of the [GLBL shares] at any time and for any reason."

49.     In connection with the execution of each of the GLBL Stock Agreements, and on several occasions thereafter, Mr. Domenech expressed concern about the absence of an automatic, accelerated-vesting provision in those Agreements in the event he was terminated without Cause.  Both before and after the parties executed each of the GLBL Stock Agreements,

Defendant Chatila repeatedly pointed out to Mr. Domenech that GLBL's Board – which Mr. Chatila chaired – could unilaterally accelerate vesting at any time for any reason.  And in each of those conversations, Defendant Chatila – speaking personally and on behalf of GLBL and its Board – repeatedly assured Mr. Domenech that GLBL's Board would accelerate the vesting of half his unvested shares if his employment with the Companies and any affiliates were terminated without Cause.  Indeed, Chatila went even further on those occasions and assured Mr. Domenech that the GLBL Board would immediately do so if there were ever any indication that he *might* be terminated without Cause.

50.     In detrimental and reasonable reliance on Chatila and GLBL's repeated promises and representations, Mr. Domenech executed the GLBL Stock Agreements and continued thereafter to work in the employment of GLBL as its President and CEO.

51.     Upon becoming President and CEO of GLBL, and at all times during which he held those positions, Mr. Domenech worked as an employee of GLBL.  He oversaw GLBL's day-to-day business operations and strategic planning and execution; reported *every day* for work at GLBL's headquarters in Bethesda, Maryland, unless he was traveling on business; traveled extensively on GLBL-related business; had a GLBL business card; regularly negotiated and executed contracts on behalf of GLBL; and reported directly to – and was directed in all of his GLBL-related business activities by – GLBL's Board of Directors.

**SUNE's Unreliable Financial
Disclosures and Liquidity Crisis**

52.     On August 27, 2015, at SUNE's Mid-Quarter Board of Directors Meeting, SUNE management – led by its CEO and CFO, Defendants Chatila and Wuebbels – reported to SUNE's Board that the company would have a cash-burn rate (*i.e.*, a net reduction in cash on hand) of

$425 million in the 4th quarter ("Q4") of 2015 and a further net cash reduction of $32 million in Q1 of 2016.

53.     Six days after that meeting, on September 2, 2015, Defendant Chatila stated during a Bloomberg Financial interview that SUNE would likely generate *positive* cash flow in late 2015 or early 2016.  Chatila's public statement was contrary to the projection he presented to the SUNE Board of Directors less than a week earlier.

54.     In mid-September 2015, Mr. Domenech – who had no financial role at SUNE in his position as an Executive Vice President of that company – raised concerns to Defendant Chatila about the coherence and transparency of presentations that had been recently made by Chatila and Wuebbels about SUNE's actual and prospective cash holdings and liquidity.  Mr. Domenech offered his help and suggested the formation of a broader group to help provide a better understanding of SUNE's cash position.

55.     In response to the concerns raised by Mr. Domenech and others, Defendant Chatila agreed to have Mr. Domenech "co-lead" with Defendant Wuebbels a working group tasked with examining the "end-to-end cash cycle" of SUNE in order to assess SUNE's cash position and financing needs (the "Working Group").

56.     In reviewing SUNE's cash position, the Working Group classified SUNE's cash into two basic categories – (i) cash that was restricted or unavailable because it was already legally committed to projects or other purposes; and (ii) unrestricted cash that is immediately available to satisfy any business need.

57.     On October 5, 2015, Mr. Domenech explained to Defendant Chatila the need for a framework to differentiate between restricted and unrestricted cash.  Mr. Domenech also informed Chatila that based on the best information available to the Working Group, SUNE's

then-current *unrestricted* cash figure appeared to be **$342 million.**  In presenting that figure, Mr. Domenech cautioned that it was necessarily an approximation because the Working Group – which was supposedly being co-led by SUNE's CFO, Defendant Wuebbels – was having considerable difficulty obtaining current information from SUNE's finance department.

58.    Two days after that conversation – during an October 7, 2015, business-update webcast open to the public – Defendant Chatila stated that SUNE "remains well capitalized with adequate liquidity."  In the same webcast, Defendant Wuebbels said that "excluding the cash from TerraForm [Power] and Global, the cash available at the standalone devco [*i.e.*, SUNE alone] was standing at approximately **$1.4 billion** at the end of the [3rd] quarter (September 30, 2016), up from $900 million at the end of the 2nd quarter."  And in a PowerPoint presentation given during the webcast, Chatila and Wuebbels respectively described SUNE's liquidity position as **"robust"** and **"strong."**  The PowerPoint presentation noted that the $1.4 billion "available cash" figure "[i]ncludes cash committed for construction[,]" but did not reveal the amount of *unrestricted* cash SUNE had on hand at the end of Q3.

59.    The next day, October 8, 2016, Mr. Domenech convened a conference call with two SUNE Board members and demanded that the Board retain independent accounting and financial advisors to investigate the company's liquidity position and the accuracy of its financial reporting on that issue.  The participants in the call were Defendant Hernandez, the Chair of SUNE's Board, and Steven Tesoriere, the Chair of the Finance and Investment Committee of SUNE's Board and a director of GLBL and TERP.  Francisco Perez Gundin ("Mr. Perez"), another member of the Working Group who served as a SUNE Executive Vice President and the Chief Operating Officer ("COO") of SUNE, GLBL, and TERP, as well as a director of GLBL and TERP, also participated in the call.  Messrs. Domenech and Perez told the two SUNE

directors about the efforts and concerns of the Working Group; expressed concerns about the lack of transparency into SUNE's cash position and the basis for its projections; identified certain inconsistencies between the internal and public statements Defendants Chatila and Wuebbels had made about SUNE's cash position; and explained the reasons they believed that SUNE's unrestricted cash appeared to be substantially below the publicly-reported "available cash" figure of $1.4 billion.

60.     Despite the concerns and warnings of Messrs. Domenech and Perez, SUNE's Board did not hire independent financial and accounting advisors to analyze SUNE's liquidity position. Instead, Defendant Hernandez merely directed Defendants Chatila and Wuebbels to give a "presentation" about SUNE's liquidity position to the Board on October 23, 2015. Notably, Defendant Hernandez is a longtime mentor to, colleague and friend of, Defendant Chatila's. Before joining SUNE and/or its Board, Hernandez and Chatila worked together for more than 10 years as senior executives at Cypress Semiconductors.

61.     Over the next two weeks, Mr. Domenech continued to express concerns about SUNE's liquidity position to SUNE's Board of Directors and other members of SUNE's senior management. For example, Mr. Domenech called Defendant Hernandez, SUNE's Chairman, multiple times during October 2015, to reiterate his concerns and recommend again that the Board retain outside, independent financial advisors to examine SUNE's actual cash position and the reliability of the representations being made by Defendants Chatila and Wuebbels in that regard.

62.     On each occasion, Defendant Hernandez "thanked" Mr. Domenech for raising his concerns to the Board and assured him that SUNE's Board appreciated the serious nature of the situation and was attending to it carefully. Defendant Hernandez also stated that he was working

closely with Defendant Blackmore, who was the Chair of the SUNE Board's Corporate Governance Committee at the time, in assessing and responding to the concerns regarding SUNE's cash position.  During those calls, Defendant Hernandez repeatedly referred to Defendant Blackmore as his "sounding board."  Hernandez repeatedly emphasized in those calls that the Board "needs to go through a process" given the serious nature of the concerns. Defendant Hernandez also asked Mr. Domenech to be "patient," and "trust" SUNE's Board to address the situation properly at the completion of that process.

63.     Also in mid-October of 2015, amidst their efforts to prepare a presentation to SUNE's Board on SUNE's liquidity position, Defendants Chatila and Wuebbels proposed a transaction between SUNE and GLBL that – tellingly – would have provided SUNE with an immediate cash infusion from its subsidiary.  More specifically, Chatila and Wuebbels proposed that a subsidiary of GLBL purchase from another subsidiary of SUNE certain solar projects that were in the early stages of development in India for $49 million (the "Proposed India Solar Transaction").

64.     Mr. Domenech advised GLBL's Board, and its Conflicts Committee, that he opposed the Proposed India Solar Transaction for several reasons that he had previously articulated.  Notably, the projects included in the Proposed India Solar Transaction had been considered, and rejected, by GLBL less than three months earlier at the time of GLBL's IPO.  In connection with the IPO, GLBL disclosed to investors the anticipated uses of the funds raised by the IPO, including the projects that GLBL intended to purchase with those funds.  The projects included in the Proposed India Solar Transaction were rejected by GLBL at the time of the IPO, and not included in GLBL's use of proceeds disclosures, because they did not offer a high enough rate of return, were too early in the development stage, and did not fit within the

geographic distribution criteria GLBL had set for its project portfolio.  None of those factors had changed materially by mid-October of 2015.  Indeed, the only material change that had occurred since GLBL's IPO was SUNE's need for cash, which was not a proper basis for GLBL to enter into an otherwise unsatisfactory transaction.  Mr. Domenech also expressed the view that, given concerns about SUNE's liquidity position and its apparent inability to provide collateral or other security for the pre-payments, GLBL should not pre-pay SUNE for projects still in the early stages of development.  He also emphasized that ultimately the company would need a fairness assessment from a qualified independent advisor in order for the Conflicts Committee to approve the transactions.

65.     On October 19, 2015, Mr. Domenech attended a SUNE sponsored "Quarterly Business Review" (the "QBR"), at which Defendants Chatila and Wuebbels presented certain preliminary financial results and forecasts to senior management of the Companies.  During that meeting, Chatila and Wuebbels projected that SUNE would have a cash-burn rate of $801 million in Q4 of 2015 and $521 million in Q1 of 2016.  Defendants Chatila and Wuebbels also provided a six-quarter forecast showing a cumulative cash-burn rate of $1.075 billion.

66.     Shortly before, and immediately after the October 19, 2015 QBR, Defendant Chatila met individually with senior executives and managers in charge of the Companies' operating units in an effort to coerce them into changing revenue and expense forecasts for the respective business units so that Chatila could reduce SUNE's projected cash-burn rate. Defendant Chatila conducted one such meeting with Mr. Perez – the COO of GLBL, TERP and SUNE.  Mr. Perez responded to Chatila's request by stating that Mr. Perez had no realistic, factual basis for lowering the projected cash-burn rate of any SUNE units into which Mr. Perez had visibility.  Mr. Perez also expressed the view that, rather than attempting to alter forecasts,

Chatila and SUNE should take meaningful actions to address SUNE's liquidity situation. Defendant Chatila immediately became agitated, berated Mr. Perez in a profanity-laced tirade, and told him that his job was to follow Chatila's directions.  Mr. Perez responded by stating that Chatila could fire him if he wanted, but Mr. Perez would not merely do as he was told.

67.     On October 21, 2015 – two days before they were supposed to give a presentation to the SUNE Board about SUNE's cash position and projections – Chatila advised the SUNE Board that he and Wuebbels needed to postpone the presentation.  Defendant Hernandez agreed to have the presentation given at a previously-scheduled meeting of SUNE's Board on October 26, 2015.

68.     Later in the day on October 21, 2015, Mr. Domenech and Defendant Hernandez discussed the postponement of the liquidity presentation and the question of whether SUNE's Board should replace Defendant Chatila as SUNE's CEO.  Mr. Domenech informed Defendant Hernandez about the cash-burn rates that Chatila and Wuebbels had projected at the QBR, and suggested that Chatila and Wuebbels likely needed more time because they were trying to come up with a new, more favorable forecast for SUNE's Board.  Mr. Domenech stated that given the lack of transparency into SUNE's liquidity position and the serious, continuing questions about the accuracy of Chatila and Wuebbel's internal and external statements on that critical issue, SUNE's Board should strongly consider replacing both Chatila and Wuebbels.  With respect to the position of CEO of SUNE, Mr. Domenech suggested that Hernandez should consider taking on the role of Executive Chairman and interim CEO of SUNE in order to gain better visibility into, and control over, SUNE's liquidity position and related operations and reporting. Defendant Hernandez – Chatila's long-time patron – made no attempt to defend Chatila or Wuebbels and expressed concern about their inability to produce a timely report to SUNE's

Board about the company's liquidity position.  Defendant Hernandez also told Mr. Domenech

that SUNE's Board was continuing to go through its process of assessing the company's liquidity

and the performance of Chatila and Wuebbels, and would take appropriate action when they

completed that process.  Implying that Chatila was likely to be replaced, Defendant Hernandez

stated that he needed to invoke a "trust me card" during the pendency of the SUNE Board's

evaluation process.  Hernandez also reiterated that he was working closely with Defendant

Blackmore on all of those issues, again referring to Blackmore as his "sounding board."

69.     On October 26, 2015, SUNE's Board met as previously scheduled at the

company's executive headquarters in Belmont, California.  Although Mr. Domenech and certain

other senior executives were initially invited to attend the meeting in person by Defendant

Hernandez, Hernandez rescinded those invitations at the last minute because, as he explained to

Mr. Domenech, Hernandez did not want any face-to-face confrontations to erupt during the

meeting.

70.     Mr. Domenech, along with three other senior executives of the Companies who

were also extremely concerned about SUNE's liquidity and the reliability of its cash forecasts,

nevertheless flew to California to be available in person to SUNE's Board during or after the

meeting.  Mr. Domenech was joined in the trip by Mr. Perez, Paul Gaynor, another EVP of

SUNE who was in charge of its utility operations, and Alejandro Hernandez (no relation to

Defendant Hernandez), who served as CFO of GLBL and TERP.  Messrs. Domenech, Perez,

Gaynor, and Alejandro Hernandez advised SUNE's Board in advance of the meeting that they

were available to participate in person in any or all portions of the Board meeting.  After they

had reiterated their request to participate in person several times, the SUNE Board conceded to

have Mr. Domenech and the other senior executives participate in the SUNE Board meeting *by*

*telephone* – despite the fact that they were in a hotel next to SUNE's headquarters – for a portion of the financial presentation relating to SUNE's cash position and forecast.

71.     During the meeting, Defendants Chatila and Wuebbels presented a cash forecast that was starkly at odds with the forecast they had given a week earlier at the QBR.  Chatila and Wuebbels told the Board they projected that SUNE would burn $256 million in Q4, $394 million in Q1 of 2016, and a cumulative, net total of $643 million over the next six quarters.  The differences between the projections offered by Chatila and Wuebbels at the SUNE Board meeting and the QBR just a week earlier were as follows:

| Quarter(s) | QBR Burn-Rate Forecast | 10/26 SUNE Board Mtg. Burn-Rate Forecast | % Reduction from QBR to Bd. Mtg. |
|---|---|---|---|
| Q4 2015 | $801 Million | $256 Million | 68% |
| Q1 2016 | $521 Million | $394 Million | 24% |
| Q4 2016 – Q1 2018 | $1.075 Billion | $643 Million | 40% |

72.     After the presentation by Defendants Chatila and Wuebbels, with the SUNE Board still in session, Defendant Blackmore asked Mr. Domenech and the other senior executives on the line if they wished to comment on the liquidity forecast.

73.     Mr. Perez went first, and advised Defendant Blackmore and the rest of the SUNE Board that he "completely disagreed" with the financial forecast presented to the Board by Defendants Chatila and Wuebbels.  Mr. Perez pointed out that the forecast that had just been presented to the SUNE Board depicted a far more positive outlook than Defendants Chatila and Wuebbels had presented just a week earlier in the QBR, and appeared to be based on a variety of unrealistic and problematic assumptions.  Mr. Perez also expressed concern regarding SUNE's ability to navigate over the next two quarters given that the company appeared to have less than

$90 million of unrestricted cash on hand, close to $3 billion in projects under construction, and over 2,700 employees on payroll. Moreover, Mr. Perez reported that in 2015 the Materials Division of SUNE appeared to have a cash-burn rate of $500 million and the Residential Division appeared to have a cash-burn rate of $200 million. Mr. Perez then stated that he was alarmed by SUNE's failure to investigate these financial losses and the apparent lack of reliability of SUNE's internal and external cash reporting and forecasting. He also suggested that SUNE appeared to need a significant cash infusion to address its liquidity needs and expressed concern, more generally, about SUNE's complete lack of transparency regarding its financial information.

74. Next, Defendant Blackmore asked for Mr. Domenech's feedback. Mr. Domenech expressed agreement with Mr. Perez's statements, and added his view that the assumptions in the cash forecast were insufficiently clear and transparent, appeared to be unreliable and unduly optimistic, and improperly included $49 million in Q4 of 2015 from the Proposed India Solar Transaction that was ill-suited for GLBL and had not received the necessary approval of the GLBL Conflicts Committee. Mr. Domenech also recommended that SUNE seek outside investment from a strategic partner or investor to fortify SUNE's liquidity position.

75. Mr. Blackmore then asked Mr. Gaynor to comment. Mr. Gaynor expressed grave concerns about the continuing lack of transparency into the basis for the cash figures and projections provided by Chatila and Wuebbels, and noted the stark disparity between those figures and the liquidity figures and projections that Chatila and Wuebbels had reported just a week earlier at the QBR. Mr. Gaynor also stated that the cash position statements and projections Defendants Chatila and Wuebbels had made regarding SUNE divisions under Mr. Gaynor's direct control did not appear to be reliable.

-25-

76.     Finally, Alejandro Hernandez – the CFO of GLBL and TERP – expressed concern about the lack of visibility he had into the financial affairs of SUNE and the reliability of its liquidity reporting and projections.  Alejandro Hernandez also stated that he could not understand SUNE's apparent cash predicament given that it had just raised $650 million of cash in August of 2015 through a convertible preferred stock offering.

77.     Immediately after the SUNE Board meeting, two SUNE Directors, James Williams and Randy Zwirn, asked to meet face-to-face with Mr. Domenech.  Mr. Domenech reiterated his concerns about SUNE's liquidity and related reporting during that meeting.  Mr. Williams asked Mr. Domenech for suggestions on how SUNE could address the situation.  Mr. Domenech responded by suggesting that SUNE's Chairman, Defendant Emmanuel Hernandez, should be made SUNE's Executive Chairman and CEO so that the Board could get to the bottom of the liquidity situation.  Mr. Domenech also reiterated his suggestion that SUNE should fortify its liquidity position by bringing on a strategic investor.  In that conversation, Mr. Domenech also expressed concern that Messrs. Chatila and Wuebbels, as well as the full SUNE Board, might retaliate against him for expressing his concerns about the reliability and accuracy of SUNE's liquidity reporting and projections.  Williams and Zwirn both thanked Mr. Domenech for "stepping up" in regard to those issues and assured him that SUNE's Board was looking into the concerns he and Messrs. Perez, Gaynor, and Alejandro Hernandez had raised.  Williams and Zwirn concluded the meeting by asking Mr. Domenech to trust the Board to address the situation properly and "stay focused" on running the operations of GLBL and TERP.

78.     Apparently working in tandem with other members of SUNE's Board, Defendant Blackmore called Mr. Perez immediately after the SUNE Board meeting to speak with him individually.  Defendant Blackmore told Mr. Perez that Blackmore had been kept apprised by

Defendant Hernandez of the concerns Messrs. Domenech and Perez and other executives had raised about the reliability of SUNE's statements and forecasts regarding its cash position, and that SUNE's Board was looking into the situation.  Defendant Blackmore then asked Mr. Perez to "support" Defendant Chatila, "trust" SUNE's Board, and focus on running the operations of the Companies.  Mr. Perez responded that, given his continuing concerns about the reliability of Chatila and Wuebbels' public and internal representations about SUNE's liquidity position and projections, he could no longer work effectively with either of them.  Mr. Perez also stated that unless he was reliably assured that SUNE was making accurate statements regarding its actual cash position and projections, he would not be able to perform his duties as COO of each of the Companies.

79.     On November 9, 2015, SUNE represented in its 10-Q financial statement filed with the SEC for Q3 of 2015 that as of September 30, 2015, SUNE "had access to $1.3 billion in cash and cash equivalents, including cash committed to construction projects."  And in SUNE's Q3 2015 Earnings Conference Call on November 10, 2015 – while reviewing a PowerPoint slide that contained the statement "**Liquidity Bolstered During the Quarter**" – Defendant Wuebbels stated that SUNE had **"sufficient liquidity"** of "**approximately $1.4 billion** at the end of the quarter."

80.     The liquidity position represented in SUNE's 10-Q and in the November 10, 2015, conference call included as "cash and cash equivalents" funding provided through debt facilities upon which SUNE did *not* have unrestricted ability to draw in the future.  Netting out cash available through *restricted* debt facilities, SUNE's unrestricted cash balance as of September 30, 2015 was, in fact, only approximately **$497 million.**

81.     And on November 10, 2015 – the day Defendant Wuebbels publicly stated that SUNE had approximately $1.4 billion in cash – the unrestricted cash balance across SUNE and all of its subsidiaries (other than GLBL and TERP) had dropped to approximately **$91 million**, with **SUNE itself holding only $22 million**.

82.     On or after November 10, 2015, Defendant Chatila asked Mr. Perez to "find a way" for GLBL and/or TERP to lend $100 million without the knowledge of the lending company or companies' Conflicts Committee(s).  Defendant Chatila also requested that Mr. Perez use his influence with GLBL and TERP's senior executive teams to persuade them to go along with Chatila's plan.  Mr. Perez declined Chatila's request and promptly reported Chatila's improper request to Messrs. Domenech, Alejandro Hernandez, the GLBL and TERP Conflicts Committees, and the General Counsel of TERP.

83.     On November 18, 2015, the unrestricted cash balance across SUNE and its other subsidiaries fell to approximately **$74 million**.  Given the severity of SUNE's cash predicament, Mr. Perez recommended to Defendant Chatila that day that SUNE evaluate the option of filing for bankruptcy protection.  Chatila responded by stating that he was giving serious consideration to having SUNE do so.  Thus, merely nine days after he and Defendant Wuebbels had publicly represented that SUNE had "sufficient liquidity," Defendant Chatila was discussing the need to declare bankruptcy in order to address SUNE's liquidity crisis.

84.     Mr. Perez reiterated on November 19, 2015, to Defendant Chatila that SUNE would be well advised to consider strongly the option of filing for bankruptcy.  Defendant Chatila again indicated that he was seriously considering that option for SUNE.

85.     As of the morning of November 20, 2015, SUNE and its other subsidiaries'

unrestricted cash balance had dropped to approximately **$16 million**, with SUNE, excluding its

subsidiaries, having only approximately **$0.7 million** in unrestricted cash.

***SUNE Attempts to Coerce the Yieldcos***
***Into Transactions Against Their Best Interests***

86.     In an effort to address its liquidity crisis, SUNE brazenly attempted to force

transactions upon GLBL and TERP that were proposed neither in good faith nor with any regard

for the interests of GLBL and TERP's public shareholders.

87.      In addition to the Proposed India Solar Transaction involving GLBL discussed

above, Defendants Chatila and Wuebbels advocated for another Proposed Self-Dealing

Transaction related to the assets of Vivint Solar, Inc. ("Vivint").  On July 20, 2015, Defendant

TERP had agreed to purchase from SUNE certain renewable power assets of Vivint as to which

SUNE held acquisition rights (the "Vivint Drop-Down Agreement").  Under the Vivint Drop-

Down Agreement, SUNE was to receive approximately $922 million in aggregate cash from

TERP.

88.      All amendments to the Vivint Drop-Down Agreement required TERP's consent,

which could only be granted by the TERP Conflicts Committee.  The TERP Conflicts

Committee, at the time, consisted of only two directors – Hanif Dahya and Mark Lerdal – neither

of whom held any positions with TERP's controlling parent, SUNE.

89.     On November 6, 2015, Mr. Domenech attended a meeting of the TERP Conflicts

Committee to discuss certain proposed amendments to the Vivint Drop-Down Agreement.  The

proposed amendments related to a reduction in the amount of energy generated from the assets

TERP was to acquire, a change in the amount TERP was obligated to pay, and a revision giving

SUNE flexibility to sell Vivint assets to third parties rather than only to TERP.  Defendant

Wuebbels requested that the TERP Conflicts Committee approve all aspects of all amendments by the following business day, prior to SUNE's and TERP's Q3 earnings releases, despite the fact that the TERP Conflicts Committee had not seen *any* documentation relating to the proposed amendments.  The TERP Conflicts Committee declined to approve the amendments at that time, but advised Wuebbels that it would continue to evaluate them.

90.     Six days later, at a November 12, 2015, TERP Conflicts Committee meeting, Defendant Chatila demanded that the TERP Conflicts Committee approve the amendments to the Vivint Drop-Down Agreement by the end of that day.  As Defendant Chatila well knew, SUNE had not yet provided requested financial information necessary for the Committee's advisors to complete their financial analysis and the TERP Conflicts Committee had only engaged legal and financial advisors the previous day.  Mr. Domenech attended this meeting and voiced his concerns about certain material aspects of the Vivint Drop-Down Agreement, as well as the fact that the Committee had insufficient time to review the proposed amendments and consult with its independent legal and financial advisors.  TERP's Conflicts Committee did not approve the proposed amendments, but indicated to Chatila that it would continue to evaluate them.

91.     Shortly after that meeting, Defendant Chatila made a thinly-veiled threat to TERP Conflicts Committee member Hanif Dahya, telling Dahya that the Committee "was not moving fast enough" and that SUNE wanted "a more agile Committee."

92.     At a November 18, 2015, TERP Conflicts Committee meeting that Mr. Domenech attended, the TERP Conflicts Committee discussed a request from SUNE in which TERP would repurchase $104 million of TERP shares from SUNE (the "Repurchase Proposal").  SUNE looked to TERP for emergency help after a decline in TERP's stock price had triggered an overnight call of $100 million on a margin loan to SUNE secured by certain shares of TERP

owned by SUNE.  The TERP Conflicts Committee ultimately decided against the Repurchase Proposal.

93.     At that same November 18, 2015, meeting, Defendant Chatila suggested other ways for TERP to "support" SUNE amidst the liquidity crisis, including prepayment for assets and extending an unsecured loan to SUNE.  The TERP Conflicts Committee rejected those SUNE-favorable proposals due to SUNE's precarious financial position and the consequent risk the proposed transactions posed for TERP and its shareholders.

94.     On November 19, 2015, with Mr. Domenech in attendance, the TERP Conflicts Committee declined to grant SUNE's request that TERP release restrictions on certain shares of TERP owned by SUNE.  The TERP Conflicts Committee explained that in consideration for releasing those restrictions, the Conflicts Committee wanted SUNE to convey something of value in return to TERP, such as relinquishment of certain control rights over TERP.  Defendant Chatila responded by stating to Mr. Perez that the Conflicts Committee's requirement of consideration in return for the restriction release was an "**act of war**."

95.     Immediately after the meeting, Defendant Chatila scheduled a special meeting of the TERP and GLBL Boards to take place on the following day.  Despite requests by Messrs. Domenech for the Chairman of each Board to provide an agenda and materials in advance of the meeting, Chatila – the Chairman of both Boards – refused to do so until minutes before the meetings.

*The "Friday Night Massacre"*

96.     On November 20, 2015, at meetings of the GLBL and TERP Boards, SUNE – through the direct or indirect efforts of each of the Individual Defendants – acted with utter

disregard for the interests of GLBL and TERP's public shareholders to eliminate all governance impediments to SUNE's ability to draw cash at will from the yieldcos.

97.     As an initial step, SUNE exercised its right as the majority owner of Class B Common Stock of GLBL and TERP, respectively, to designate three new, SUNE-loyal members to the GLBL and TERP Boards and Conflicts Committees.

98.     Defendant Chatila then resigned as Chairman of GLBL and TERP, but remained a member of both Boards.

99.     Defendant Blackmore – Defendant Chatila and Hernandez's confidante who had been personally warned by Messrs. Domenech and Perez about SUNE's liquidity problems and unreliable forecasts and had done absolutely nothing in response – "resigned" from SUNE's Board and was immediately installed by SUNE as the new Chairman of the Boards of GLBL and TERP.

100.     Because he was no longer a member of the SUNE Board as of November 20, 2015, Defendant Blackmore was now able to masquerade as an "independent" director of GLBL and TERP and serve on the Conflicts Committee that could approve transactions between those Companies and SUNE.  Despite his public claims to the contrary, Defendant Blackmore knew at all relevant times that all of the transactions SUNE sought to enter into with GLBL and TERP on and shortly after November 20, 2015, were designed to bail SUNE out of its liquidity crisis at the expense of GLBL and TERP and their public shareholders.

101.     After SUNE added the new SUNE-loyal members to the TERP and GLBL Boards, Messrs. Lerdal and Dahya were removed from the GLBL and TERP Conflicts Committees and replaced with SUNE loyalists, including Defendant Blackmore.  When asked

directly by Mr. Lerdal why the Conflicts Committees' members were being replaced, Defendant Blackmore offered no explanation.

102.     The expanded GLBL and TERP Boards then terminated Alejandro Hernandez from his positions as CFO of TERP and GLBL without cause.  As discussed above, Alejandro Hernandez – along with Messrs. Domenech, Perez, and Gaynor – had raised concerns to the SUNE, TERP and GLBL Boards regarding the transparency and accuracy of SUNE's internal and external representations as to its financial position.  Alejandro Hernandez was replaced shortly thereafter by SUNE-insider Rebecca Cranna, who also served as CFO of Global Asset Management for SUNE.

103.     To further consolidate its control of GLBL and TERP, SUNE – acting through its hand-picked henchman, Defendant Blackmore, and its other loyalists on the GLBL and TERP Boards – then used its controlling power to terminate without cause Mr. Domenech's employment as President and Chief Executive Officer of GLBL and TERP and remove him from the GLBL and TERP Boards.  That same afternoon, SUNE's Human Resources Director, Stephen Cerrone, appeared unannounced at GLBL and TERP's offices and advised Mr. Domenech that he was being terminated without cause from all other positions with SUNE and any of its other affiliates.

104.     Mr. Domenech was immediately replaced on Friday, November 20, 2015, as President and CEO of GLBL and TERP by Defendant Wuebbels – SUNE's CFO who, along with Defendant Chatila, had been making false and misleading statements to the market about SUNE's liquidity position and forecasts and internally advocating for self-dealing transactions that would benefit SUNE to the detriment of GLBL and TERP and their public shareholders.

105.     Defendant Blackmore – GLBL and TERP's newly installed Chairman and Conflicts Committee member – knew when he recommended and voted to install Defendant Wuebbels as President and CEO of GLBL and TERP that Wuebbels had publicly and privately misrepresented SUNE's liquidity position and forecasts and, like Blackmore, intended to use his positions within GLBL and TERP in an effort to rescue SUNE from its liquidity crisis without regard for the interests of GLBL and TERP's public shareholders.

106.     As Defendant Chatila explained in Orwellian terms during a November 23, 2015, call with the Companies' executive leadership teams, the Friday Night Massacre was designed to eliminate any and all dissent and meaningful governance protections that could stand in the way of SUNE's ability to use GLBL and TERP for its own self-interested purposes.  The purge, according to Chatila, demonstrated that **if any leaders of any of the Companies were not "rowing in the same direction, the whole organization is going to reject them and <u>eat them alive</u>."**

*Defendants Immediately*
*Approve Improper, Self-Dealing Transactions*

107.     Facing an acute liquidity crisis, but armed with complete control over GLBL and TERP through the firing of Mr. Domenech and related appointment of SUNE-surrogate Blackmore as GLBL and TERP's supposedly "independent" Chairman and Conflicts Committee Chair, the Defendants began approving – within *minutes* of Blackmore's appointment – self-dealing transactions designed to divert hundreds of millions of dollars of cash from GLBL and TERP to SUNE in return for grossly inadequate consideration.

108.     For example, *within minutes* of purging Mr. Domenech and others, Defendant Blackmore led the re-constituted GLBL Conflicts Committee to push through a substantially expanded version of the India Solar Transaction that had previously been rejected as unfair to

GLBL by Mr. Domenech and GLBL's prior Conflicts Committee.  Of the total consideration of $231 million paid by GLBL to SUNE in connection with that transaction, $150 million in cash was paid by wire that afternoon – on *November 20, 2015* – without any restriction requiring SUNE to use the cash for the development of the subject projects in India.  The newly-constituted Conflicts Committee did so despite the fact that it received no notice of the expanded India Solar Transaction and without making any effort whatsoever to obtain independent financial or legal advice or the input of Mr. Perez, GLBL's General Counsel, or any other senior executives of GLBL.  Notably, the *only* persons who advised the new GLBL Conflicts Committee regarding the India Solar Transaction on November 20, 2015, were Defendants Chatila, Wuebbels, and Truong – all of whom had conflicts of interest as officers and directors of SUNE.  Indeed, Defendant Truong actually signed the governing Purchase and Sale Agreement (the "PSA") for the transaction *on behalf of SUNE*.

109.    Based on the plain language of the PSA, his discussions with Messrs. Domenech and Perez and personal knowledge that SUNE was in the midst of a severe liquidity crisis, Defendant Blackmore knew at all relevant times that the expanded India Solar Transaction was unfair to GLBL and its public shareholders.  Yet with utter disregard for the interests of GLBL's public shareholders, he shepherded that transaction through the newly-reconstituted GLBL Conflicts Committee.  Defendant Blackmore recommended and obtained Conflicts Committee approval for a transaction that he knew to be intentionally structured to pump cash into SUNE without adequate protection from, or consideration for, the clear and present risk that SUNE would not be able to complete the project – which is exactly what happened.

110.    As soon as GLBL wired the $150 million to SUNE in connection to the India Solar Transaction, SUNE immediately wired $100 million to the lender of its margin loan.  After making that emergency payment, SUNE's liquid cash fell to approximately **$50 million**.

111.    On December 1, 2015, SUNE and GLBL agreed to amend the India Solar Transaction such that the full $231 million was prepaid.  SUNE thus successfully extracted another $81 million in cash from GLBL for its own immediate benefit without providing any material consideration in return for that concession.  The amendment was approved by the reconstituted GLBL Conflicts Committee and the entire GLBL Board at the recommendation of Defendant Blackmore, again without regard for the interests of GLBL's public shareholders.

112.    On the day Defendant Blackmore led the approval of the amended India Solar Transaction, SUNE's stock price had fallen to $3.49 per share, down 88% since July 20, 2015, and the prospect of SUNE declaring bankruptcy was clearly on the horizon.

### SUNE Collapses/Defendants Fail and Refuse to Compensate Mr. Domenech for His Wrongful Discharge

113.    On February 29, 2016, SUNE announced that it would delay filing its annual report on Form 10-K.

114.    On March 16, 2016, SUNE announced a further delay in filing its Form 10-K to complete additional work required because SUNE's management had identified material weaknesses in SUNE's internal controls over financial reporting.

115.    On March 29, 2016, GLBL filed a Form 8-K with the SEC announcing that GLBL anticipated that the filing of its Form 10-K would be delayed.  The Form 8-K revealed myriad problems associated with the incomplete projects that GLBL was supposed to receive as consideration for the $231 million it pre-paid in the amended India Solar Transaction.  For example, the Form 8-K stated:

> There are currently material amounts of project costs and equity contributions that remain to be contributed by SUNE to the India Projects.  If [SUNE] is unable to fund these amounts, some or all of the India Projects may not be completed or transferred to [GLBL] on time or at all, and as a result [GLBL] would have to seek to recover the applicable portion of the prepaid purchase price amount from [SUNE].

116.    Two days later, SUNE announced in a Form 8-K filed with the SEC on March 31, 2016, that, in addition to being investigated by the SEC, it had received a subpoena from the U.S. Department of Justice seeking information and documents relating to, among other topics, intercompany transactions between SUNE and each of GLBL and TERP and certain investigations by SUNE's audit committee.

117.    As noted above, SUNE filed for Chapter 11 bankruptcy on April 21, 2016.

118.    On September 27, 2016, GLBL announced that it consented to the sale by SUNE to a third party, through the SUNE bankruptcy proceeding, of all of the projects for which GLBL pre-paid $231 million in connection with the amended India Solar Transaction.  According to the announcement, GLBL does not anticipate receiving more than $10 million in return for its consent and is relinquishing all claims against the third-party buyer to any rights in the projects.

119.    To date, despite due demand and total validation of the concerns Mr. Domenech raised to all of the Defendants about SUNE's financial reporting and the India Solar Transaction, Defendants have failed and refused to accept responsibility for their unlawful, retaliatory discharge of Mr. Domenech and compensate him for the severe economic harm and emotional distress he has suffered at their hands.

## FIRST CAUSE OF ACTION

### RETALIATION IN VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK)
### (Against All Defendants)

120.    Mr. Domenech repeats and re-alleges the preceding allegations as if fully set forth herein.

121.    Mr. Domenech was a direct employee of SUNE and each of Defendants GLBL and TERP, as well as a joint employee of all three Companies.

122.    Mr. Domenech made disclosures to the Boards of SUNE, GLBL and TERP that were required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 et seq.), the Securities and Exchange Act of 1934, including and without limitation Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78l) and Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q), and other laws, rules, or regulations subject to the jurisdiction of the SEC.  More specifically, Plaintiff disclosed, among other misconduct, financial misreporting by Defendants Chatila and Wuebbels in public statements and filings.

123.    Mr. Domenech had both a subjectively and objectively reasonable belief that the conduct being reported violated a covered law, rule, or regulation.

124.    All of the Defendants knew or suspected that Mr. Domenech engaged in such protected activity.

125.    Each of the Companies terminated Mr. Domenech, and did so at the behest of each of the Individual Defendants.

126.    The Companies discharged Mr. Domenech because of his protected activity.

127.    As a proximate result of Defendants' actions against Mr. Domenech, as alleged above, Mr. Domenech has been harmed in that he suffered the loss of salary, benefits, bonuses, vesting of stock grants, and other money that he would have received if he had not been subjected to the retaliatory treatment.  As a result of such conduct, Plaintiff has suffered damages in an amount according to proof.

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against GLBL)**

128.    Mr. Domenech repeats and re-alleges the preceding allegations as if fully set forth herein.

129.    Mr. Domenech and GLBL are parties to the GLBL Stock Agreements.  Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

130.    Mr. Domenech performed all, or substantially all, of the significant actions that the contracts required him to perform.

131.    Defendant GLBL acted in bad faith and unfairly interfered with Mr. Domenech's right to receive the benefits of the contracts by terminating his employment without "Cause" as defined under the contracts while failing to order the immediate vesting of the then-remaining unvested shares of GLBL stock.

132.    This termination had the intended effect of depriving Mr. Domenech of the stock benefits to which he was entitled under the GLBL Stock Agreements.

133.    Mr. Domenech has been harmed in that he suffered the loss of benefits, equity award vesting, and other money that he would have received had the two contracts been fully performed.  As a result of such conduct, Mr. Domenech has suffered damages in an amount according to proof.

## THIRD CAUSE OF ACTION

### PROMISSORY ESTOPPEL
### (Against GLBL and Chatila)

134.    Mr. Domenech repeats and re-alleges the preceding allegations as if fully set forth herein.

135.    On behalf of GLBL, Defendant Chatila promised Mr. Domenech that if Plaintiff continued to work as President and CEO of GLBL after signing the GLBL Stock Agreements, GLBL would accelerate vesting of 50% of all unvested shares if Mr. Domenech were terminated without Cause.

136.    Mr. Domenech relied to his detriment upon the promise made by Defendant Chatila on behalf of GLBL and conferred benefit upon both Defendants.

137.    Mr. Domenech was terminated by GLBL and the other Companies without Cause, but Defendants GLBL and Chatila have failed and refused to honor their promise to accelerate the vesting of 50% of Mr. Domenech's unvested shares of GLBL.

138.    Mr. Domenech is entitled to enforcement of that promise, or money damages to compensate him for Defendants breach thereof.

## FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against TERP)

139.    Mr. Domenech repeats and re-alleges the preceding allegations as if fully set forth herein.

140.    Mr. Domenech and TERP are parties to the TERP Stock Agreement dated February 24, 2014.  Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

141.    Mr. Domenech performed all, or substantially all, of the significant actions that the contract required him to perform.

142.    Defendant TERP, acting in concert with the other Companies, acted in bad faith and unfairly interfered with Mr. Domenech's right to receive the benefits of the contracts by terminating Mr. Domenech's employment without "Cause" as defined under the contract while failing to order the immediate vesting of the then-remaining unvested shares of TERP stock.

143.    This termination had the intended effect of depriving Mr. Domenech of the stock benefits to which he was entitled under the TERP Stock Agreement.

144.    Mr. Domenech  has been harmed in that he suffered the loss of benefits, equity award vesting, and other money that he would have received had the two contracts been fully performed.  As a result of such conduct, Mr. Domenech has suffered damages in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Two times the amount of back pay otherwise owed to the Plaintiff, with interest at the maximum legal rate;

B.    For any other money judgment representing compensatory damages including lost wages, earnings, stock award vesting, retirement benefits and other employee benefits, and all other sums of money, together with interest at the maximum legal rate on these amounts, according to proof;

C.    For a money judgment for mental pain and anguish and emotional distress, according to proof, with interest at the maximum legal rate, according to proof;

D.    For equitable and/or injunctive relief according to proof;

E.    For an award of punitive damages, according to proof;

F.    Compensation for litigation costs, expert witness fees, and attorneys' fees; and

G.    Such other and further relief for Plaintiff as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.


Respectfully Submitted,

/s/ Nicholas Woodfield
R. Scott Oswald
*Counsel for the Plaintiff*
Nicholas Woodfield
*Counsel for the Plaintiff*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com


Kevin J. O'Connor (pending *pro hac vice*)
James L. Tuxbury (pending *pro hac vice*)
Rhiannon A. Campbell (pending *pro hac vice*)
*Counsel for the Plaintiff*
Hinckley, Allen & Snyder LLP
28 State St., 30th Floor
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (facsimile)
koconnor@hinckleyallen.com
jtuxbury@hinckleyallen.com
rcampbell@hinckleyallen.com